ORVILLE A. JONES *vs.* INEZ B. WOOD & others.

Worcester. September 21, 1953. — November 5, 1953.

Present: QUA, C.J., LUMMUS, RONAN, WILKINS, & COUNIHAN, JJ.

*Negligence,* Contributory, Elevator.

In an action of tort against the owner of a building for personal injuries sustained when the plaintiff fell down the shaft of a freight elevator from a floor at which the automatic safety gate of the elevator was out of order and was in a raised position although the elevator was not at that floor, recovery was precluded as a matter of law by the plaintiff's own conduct where it appeared that he walked along a corridor in "a very obscure twilight" to the elevator entrance carrying in front of him a large package partially obstructing his view ahead and ascertained by feeling with one hand that the gate was not down in position across the entrance, and then stepped forward through the entrance into the shaft notwithstanding that he was aware that the gate was "in bad condition" and sometimes did not "work freely and perfectly," that it was "pitch black" in the shaft, and that absence of light from a bulb in the top of the elevator might have indicated to him that the elevator was not at that floor.

TORT. Writ in the Superior Court dated June 27, 1946. The action was tried before *Warner,* J.

*Stanley B. Milton,* (*Robert C. Milton & Arthur V. Sullivan* with him,) for the defendants.

*Thomas S. Carey,* for the plaintiff.

WILKINS, J. On March 27, 1944, the defendants were the owners of a four story building on Southbridge Street,

Worcester, and the plaintiff was an employee of Barry Tool & Specialty Company, a tenant of a portion of the third floor. On that day the plaintiff, while .carrying a package which had been shipped to his employer, stepped into an open freight elevator shaft through a doorway leading off a common passageway on the first floor, and was hurt. This action of tort is brought for the benefit of the workmen's compensation insurer and the plaintiff. G. L. (Ter. Ed.) c. 152, § 15, as appearing in St. 1943, c. 432. There was a verdict for the plaintiff, and the defendants allege exceptions to the denial of their motions for a directed verdict.

The jury could have found these facts. The plaintiff was an assistant to the manager, and did supervisory work and "nearly all the shipping" for the Barry company, a manufacturer of firing pins. The elevator, operated manually by cable, was used by tenants to transport freight to and from their respective floors. The base of the elevator shaft was at the boiler room about twelve feet below the street floor. There were entrances to the elevator from each of the four floors, from the boiler room, and from a passageway about three feet below the street floor which led to a shipping platform in back of the building. The entrance at the street floor was in a fifteen foot corridor, six to seven feet wide, reaching from the front door to a stairway of the same width leading upstairs. This entrance was at the foot of the stairway, and had a double fire door, metal covered, on which were a bar and padlock but no handles. Each door was two feet wide, swinging open into the corridor, one door to the right and the other to the left. Inside a metal safety gate operated automatically. If in proper working order, this gate was in a raised position about six feet above the street floor level when the elevator was at that floor, but formed a barrier to the shaft at other times. When the plaintiff fell, the gate was not in proper working order, and was in a raised position although the elevator was not at the street floor level. The fire doors and the front door were the only ones in the corridor.

During the morning of March 27, 1944, the plaintiff descended the stairway to the street floor to obtain a package from an automobile parked on Southbridge Street. Ever since he entered the employ of the Barry company the preceding September the plaintiff had made daily use of the elevator for raising and lowering freight packages between the street and third floors. Some of these packages were removed by expressmen or truckmen. As the plaintiff went out that morning, he observed that one fire door was open. He took from the automobile a cardboard carton approximately fifteen to sixteen inches wide by ten inches high by ten inches deep and weighing between fifty and seventy-five pounds. The plaintiff reëntered the corridor holding the package in front of him with both hands. At the entrance to the elevator he did not set the load down, but felt with one hand to ascertain if the gate was there. Finding that it was not, he took one step with his right foot to place the package on the floor of the elevator, and, still holding it, fell to the bottom of the shaft. At that time there were no lights burning in the corridor or in the shaft. As he faced the fire doors, only the one on his left was open. He did not move the other door, but entered through the half opening.

The plaintiff testified that "it was dark there"; that he "would call it a very obscure twilight; that it couldn't be termed pitch dark; that in the elevator well it was pitch dark; that so far as the elevator well was concerned, that was pitch black; that he couldn't see a thing ahead of him; that the bundle he had came about midway between his chin and his waist, and extended beyond his body approximately a foot, so that his vision even in light would be partially obstructed by the box towards his feet, or at least towards the first step that he took; that he might see the end of his toes even at the first step that he took." We quote from the plaintiff's cross-examination: "Q. Before you stepped in, did you look in? A. Yes. Q. When you looked in, was it pitch black? A. Yes. Q. You didn't see a thing? A. No. Q. You couldn't see a thing? A. No. Q. You stepped into an area where it was pitch black?

A. Yes, sir.  Q. There wasn't any twilight zone in there? A. No, the well was dark."

The plaintiff also testified that he had been aware for three or four weeks that the gate "was in bad condition." "Sometimes it would work freely and perfectly.  Other times, not.  That wasn't so much from personal observation as from comments by the truck drivers who called there for freight that I had sent down."  On no occasion did he personally find the gate not in position when the elevator was at some other level.

The first question is whether the plaintiff had the status of an invitee in using the elevator at the street floor.  There being no direct invitation by the defendants, the plaintiff's rights were derived from, and no greater than those of, the tenant, his employer.  *Peirce* v. *Hunnewell,* 285 Mass. 287, 290.  *McCarthy* v. *Isenberg Bros. Inc.* 321 Mass. 170, 172. *Levins* v. *Theopold,* 326 Mass. 511, 512.  *Corbett* v. *Salusti, ante,* 273, 276.  A former officer of the Barry company, one Krock, testified that when he hired the third floor space for the company, he asked the representative of the owners about using the elevator for receiving and sending freight, and was told "that we had rights to it with other tenants in common."  It is strongly contended that there was no evidence of any use at the street floor, at least to the knowledge of the defendants.  We assume, without deciding, that the jury might properly find from this statement a right upon the part of tenants to use the elevator at the street floor, particularly in view of the construction of the building, including the presence of an elevator entrance in the corridor which led from the front entrance of the building but which contained no doorway to premises of other tenants or of the owners.

The duty which the defendants owed the plaintiff was "to use reasonable care to maintain common approaches in as good condition as they were in or appeared to be in at the time of the letting to the tenant."  *McCarthy* v. *Isenberg Bros. Inc.* 321 Mass. 170, 172.  *McAvey* v. *Albany Realty Co.* 328 Mass. 310, 314.  The plaintiff contends that there

was a breach of that duty as to the elevator gate and as to lighting. See *Gallagher* v. *Murphy*, 221 Mass. 363, 366; *Donnelly* v. *Larkin*, 327 Mass. 287, 290. We pass by these questions, as we are of opinion that the plaintiff's own conduct prevents recovery. In general, it may be said that he had a right to rely to some extent upon the expectation that the gate would be in its protective position if the elevator was not at the street floor. *McAvey* v. *Albany Realty Co.* 328 Mass. 310, 313, and cases cited. But in the circumstances known to the plaintiff, he could not so rely. He had been told by truck drivers that the gate did not at times "work freely and perfectly." He testified that he had been aware for three or four weeks that the gate "was in bad condition." He also must have been aware that he did not have the benefit of light from the bulb at the top of the elevator, a circumstance which might indicate that the elevator was not at the street floor. For the plaintiff, while holding a large package before him, to ascertain that the gate was not down, and to step through the partly open fire doors into a place of utter darkness requires a finding that he was negligent.

*Exceptions sustained.*
*Judgment for the defendants.*